The FOLGER COFFEE COMPANY, Inc.,
Plaintiff,

v.

The GREAT AMERICAN INSURANCE
COMPANY, Defendant.

Civ. A. No. 18466–3.

United States District Court,
W. D. Missouri, W. D.

Aug. 12, 1971.

William H. Sanders, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., for plaintiff.

Paul H. Niewald, Gordon, Adams, Niewald & Risjord, Kansas City, Mo., for defendant.

## JUDGMENT FOR PLAINTIFF ON ISSUE OF LIABILITY

WILLIAM H. BECKER, Chief Judge.

■ This is an action on a contract of insurance under the diversity statute, § 1332, Title 28, United States Code.[1] Plaintiff's complaint is in two counts. In the first count, it is alleged that

---

1. There is an imperfection in the complaint in this case in that diversity jurisdiction is not sufficiently pleaded. Plaintiff states that:

"Plaintiff is a corporation duly organized and existing under the laws of the State of Ohio, having its principal place of business in the State of Missouri and defendant is a corporation duly organized and existing under the laws of the State of New York, engaged in the insurance business, having its principal place of business *in a state other than*

*the State of Missouri.* The matter in controversy exceeds, exclusive of interest and costs, the sum of $10,000.00." The complaint does not therefore effectively negate the possibility that defendant's principal place of business may be in Ohio, which would destroy diversity jurisdiction. Section 1332(c), Title 28, United States Code; Chapman v. Ozark Forest Products (W.D.Mo.) 246 F.Supp. 816. Plaintiff should therefore amend its complaint within seven days to state the principal place of business of defendant.

$120,448.97 worth of plaintiff's property which was in the possession of defendant's insured Ar-Ka-Mo Sporting Goods, Inc., was, on or about the 26th day of June 1969, while insured's policy with defendant was in force "was totally destroyed or damaged by risks insured against by said policy, and said destruction or damage did not happen from any of the causes excepted in said policy"; that plaintiff "performed all the conditions of said insurance on its part, and on the 7th day of January, 1970, made and delivered to the defendant a claim and demand under said policy which was then and still is due and payable, however, defendant refused and still refuses to consider or pay said claim." Count two alleges destruction of property possessed by the insured on July 7, 1969. A sum of $117,498.56 is demanded in that count. A third count demands damages for vexatious refusal to pay.

At a pretrial conference held herein on February 5, 1971, it was agreed by the parties that certain issues relating to the construction of the contract of insurance would be submitted to the Court prior to any determination of whether any trial on the potential issue of negligence of defendant's insured was necessary. A "pretrial order" filed herein on February 24, 1971, reports the agreement made by the parties on February 5, 1971. That order reads as follows:

"On February 5, 1971, a pre-trial conference was held [in] this cause. The parties announced that discovery was complete and that there was no request for leave to amend any pleadings.

"The parties have complied with the Court's pre-trial deadlines and they have filed their respective lists of witnesses and exhibits. The parties have met and agreed upon a Standard Pre-Trial Order No. 2 which has been filed and approved by this Court. At the pre-trial conference, leave was granted the plaintiff to file an Amended Standard Pre-Trial [Order] No. 2 and it was filed on that date. At the pre-trial conference the parties

announced to the Court that this action, which is a Complaint on an insurance policy, involves principally a question of law. That question involves the construction of the insurance policy upon which this action is based. The parties announced to the Court that a preliminary ruling of law on this question would undoubtedly facilitate a resolution of the controversy.

"It was agreed that the parties would file written Offers of Proof on this question in the form of briefs and that the briefs would contain what the respective parties contend with case authority supporting their positions. It was agreed that this issue is accurately framed and set out in paragraph 5 of VII of the parties Standard Pre-Trial Order No. 2 as Amended.

[That paragraph reads: "Whether [defendant's] named insured must be negligent in order for plaintiff to recover from defendant under policy number 1–00–19–31."]

"It was ordered by the Court that the written Offers of Proof filed by the parties be constructed in simple factual sentences containing no legal conclusions * * *."

The following facts, pertinent to the issue under consideration, have been admitted by the parties:

"On or about September 14, 1966, defendant made and delivered its policy of insurance, number 1–00–91–31 to Ar-Ka-Mo Sporting Goods, Inc., a Missouri corporation.

"Defendant in consideration of the payment of Ar-Ka-Mo Sporting Goods, Inc. to defendant to a stated consideration insured property at the location of 1531 Vernon, North Kansas City, Missouri, against all risk of direct physical loss.

"Defendant received payment of the premium on that policy up to and including the dates of the two losses referred to in plaintiff's Complaint.

"The insurance policy attached to plaintiff's Complaint is a true copy of policy number 1–00–19–31 made and delivered by the defendant to Ar-Ka-Mo Sporting Goods, Inc.

"Policy number 1–00–19–31 was in full force and effect in June and July, 1969.

"Ar-Ka-Mo Sporting Goods, Inc., defendant's insured under policy 1–00–19–31, was a warehouseman at 1531 Vernon, North Kansas City, Missouri, in June and July, 1969.

"In June and July, 1969, Ar-Ka-Mo Sporting Goods, Inc., was a warehouseman of property owned by the plaintiff and others.

"On or about the date set out in plaintiff's Complaint, the plaintiff did sustain damage to certain of its property which was warehoused and bailed with Ar-Ka-Mo Sporting Goods, Inc., however, the extent of that loss is not admitted.

"The loss sustained by the plaintiff as set out in its complaint resulted from one of the type of risks insured against by policy number 1–00–19–31, however, it is not admitted by defendant that either loss to this plaintiff was insured against under the terms and conditions of this policy."

According to the true copy of the insurance policy attached to the complaint herein, the following is the clause which is relied upon by plaintiff as bringing its losses within the coverage of the policy:

"III.  Property covered

The policy covers:

A.  Personal property usual to the conduct of the Insured's business, consisting principally of Premiums for Prizes, the property of the Insured, or similar property of others held by the insured *for which the insured is lia-*

*ble,* except as provided elsewhere in this policy."  (Emphasis added.)

Defendant relies on the emphasized language, contending that the word "liable" in the provision means "legally liable" and that plaintiff must therefore show the negligence of the bailee Ar-Ka-Mo Sporting Goods, Inc., before it can recover under the policy.

In cases like that at bar, however, the courts have almost uniformly held that if, from the contract construed in its entirety, the fair interpretation and construction of the insurance contract is that it was intended primarily to cover the property held by the insured, then "liable," as used within the policy, does not refer to any fixed legal liability of the insured to respond in damages, but should be construed more broadly to mean "responsible."  This view is well developed in the leading cases of Penn v. Commercial Union Fire Ins. Co., 233 Miss. 178, 101 So.2d 535, 67 A.L.R.2d 1238, and United States v. Globe & Rutgers Fire Ins. Co. (N.D.Tex.) 104 F. Supp. 632, affirmed (C.A.5) 202 F.2d 696.  See also Michigan Fire & Marine Ins. Co. v. National Sur. Corp. (C.A.8) 156 F.2d 329.[2]  Penn v. Commercial Union Fire Ins. Co., *supra,* expresses the prevailing rule precisely that the insurance covers property in possession of the bailee for which he is responsible, and does not cover the legal liability of the bailee to respond in damages.  See also Anno., 67 A.L.R.2d 1241 at pages 1254 and 1255, subparagraph (c); 4 Appleman, Insurance Law and Practice, § 2345, p. 341, note 53.75.  Missouri law is applicable in this case.  From all materials available, including Homan v. Employers Reinsurance Corporation, 345 Mo. 650, 136 S.W.2d 289, it is concluded that the Missouri courts would follow the prevailing view and construe the word "liable" in the policy in the

---

2.  While there were some special factual circumstances in Michigan Fire & Marine Ins. Co. v. National Sur. Corp. (C.A. 8) 156 F.2d 329, the theory and reasoning of the case is consistent with and in substantial degree supports the conclusions of law enunciated in this memorandum.

case at bar to be synonymous with "responsible." See definitions in 136 S.W. 2d at page 298.

In the *Globe & Rutgers case, supra,* the Government sued the defendant insurance companies for the loss of certain cotton seed which was destroyed by fire at the premises of the McCoy Gin Company, Inc., on November 18, 1949. The policies sued upon all contained the following provision, concerning the property insured:

> "On cotton, ginned and unginned, baled and unbaled, seed cotton, cotton seed, supplies of sacks and other packaging material containing or to contain cotton seed, and bagging and ties, their own, and provided the insured is legally liable therefor, this policy shall also cover such property sold but not delivered, held in trust, or on consignment or for storage."

The Government sued for the loss of cotton seed which it had contracted to buy under price support programs and which was destroyed by fire. In holding that the Government could recover without any showing of negligence on the part of the McCoy Gin Company, Inc., the Court stated as follows:

> "The contention of the defendants is that the plaintiff cannot recover under the present policies without showing that the insured is legally liable for the fire loss of the cotton seed. That view is quite arguable. The pertinent provision of the policies has been quoted in full above and the central phrase thereof reads 'provided the insured is legally liable therefor'. The words 'liability' and 'liable' have manifold meanings in law and that nuance makes 'liable' fit as well in respect to one bound to respond in duty as to one bound to respond in damages. The gin company under its caretaker duty as bailee for hire certainly was responsible for the cotton seed and obligated to keep and deliver same safely, subject to exoneration only if performance be prevented without negligence on its part. That was a present and positive liability, and in fact no other liability ever supervened. In other words that liability in being was complete, and adequately answers the terms of the policy provision. Nothing novel is being stated. In the typical instance of bailment relationship a proper delivery of the property thereupon satisfies the right of the bailor and discharges the liability of the bailee, but that does not gainsay the fact that the bailee bore a legal liability during the period of the bailment.

> "Of course when construing flexible language the best key usually is the context. The entire language of the relevant policy provision in its ordinary sense consistently points to insurance on *property*, not on the insured's *liability* for a fire loss on such property. A strained construction is required to say that 'legally liable therefor' in the central phrase defines the thing insured. Instead the more natural reading is that it defines a selective condition on the thing being insured. A simpler statement perhaps is that said central phrase is really some of the descriptive language identifying the property insured. This viewpoint may draw question on the theory that it renders such phrase sterile, presupposing the insured would necessarily and without more be legally liable in the sense herein stressed for all property 'held in trust or on consignment or for storage', but for one thing that contention would overlook the frequent tendency of bailees to attempt contractual stipulations against their common law liability. [Emphasis in original.]

> "If the policy provision in fact read 'on the liability' of the insured then to be sure it could only mean liability for fire loss of the property, and the plaintiff would fail in the suit. This is true for the simple reason that a fire insurance policy, like many forms of insurance, is a contract of pecuniary indemnity. Its subject matter must have a money measure. Such insurance on *liability* cannot become

payable apart from an incurred liability of the insured for money damages or at least a pecuniary *obligation*. The present policies however plainly purport to insure *property*, not only property of the specified kinds belonging to the insured, but also property of like kind, for which insured is liable, belonging to another owner, and the reasonable construction of the insurance contract is that the central phrase of the policy provisions means liability of the insured already present and not contingent liability ushered in by a fortuitous fire. If the contrary meaning had been intended it would have been easy to state same in unmistakable terms. This construction makes for certainty instead of contingency. The protection of the bailor is on a dependable footing. Bailor and bailee are spared the vexation of controversy as to liability of the bailee for the fire loss. No violence is done to the language of the policies. Even any fair doubt should be resolved in favor of the insured. The plaintiff has a good claim under the policies." [Emphasis in original.] 104 F.Supp. at 634–635.

In affirming the judgment, the United States Court of Appeals for the Fifth Circuit held as follows:

"In applying the policy provisions, the trial Court properly gave great weight to the fact that the entire tenor and effect of the contracts was insurance against property loss by fire and not insurance only against the legal liability of the named insured for the fire loss. The policies provide property insurance,—not indemnity or liability insurance. Whether the described commodities were owned by the insured, or 'held in trust or on consignment or for storage', in either and all events it is provided that the policy shall cover 'property'. It was likewise correctly determined by the trial Court that the phrase 'provided the insured is legally liable therefor, when

considered in connection with these policy provisions providing insurance on property, should be considered to refer to the present and existing liability of the custodian generally and not restricted to liability which was the consequence alone of a fire." 202 F.2d at 697.

To the same effect are American Eagle Fire Ins. Co. v. Gayle (C.A.6) 108 F.2d 116, 118; Germania Ins. Co. v. Anderson, 15 Tex.Civ.App. 551, 40 S.W. 200; Pacific Fire Ins. Co. v. Murdoch Cotton Co., 193 Ark. 327, 99 S.W.2d 233; Sanford Mfg. Co. v. Western Mutual Fire Ins. Co., 229 Iowa 283, 294 N.W. 406; Home Insurance Company of New York v. Peoria & P. U. Ry. Co., 178 Ill. 64, 52 N.E. 862; C. S. Rouse v. Albany Insurance Company, 257 N.C. 267, 125 S.E.2d 424; Johnston v. Charles Abresch Co., 123 Wis. 130, 101 N.W. 395.

Defendant relies on the cases of Millers' Mutual Fire Insurance Association v. Warroad Potato Growers Ass'n (C.A. 8) 94 F.2d 741; Michigan Fire & Marine Ins. Co. v. National Sur. Corp., supra;[3] McCoy v. Home Ins. Co., 170 Pa.Super. 38, 84 A.2d 249; In re Podolsky (C.A.3) 115 F.2d 965; and Orient Insurance Co. v. Skellet Co. (C.A.8) 28 F.2d 968. But those cases either applied the minority view recognized in Minnesota or involved contracts of insurance which specifically and precisely covered only the legal *liability* of the insured to respond in damages. In Orient Ins. Co. v. Skellet Co., *supra*, the insurance contract contained a provision insuring the owners of the public storage warehouse against loss on merchandise not owned by the insured "for which they may be *legally* liable" (emphasis added), as in United States v. Globe & Rutgers Fire Ins. Co., *supra*, but as the Court in the latter case noted, 104 F.Supp. at 635:

"This [Orient Ins. Co. v. Skellet Co., *supra*] would be a formidable decision in behalf of the present defendants, but for the fact that the court also said that if the policy had recited that the

3. See note 2, *supra*.

goods were held in trust, or in similar custody then there could be no doubt that the insurance was for the benefit of the real owners."[4]

Similarly, the contract involved in In re Podolsky, *supra*, (applying Minnesota law, following the minority view) insured only the insured's *"legal interest in* and * * * legal liability for * * * property held by him."* (Emphasis added.) And, in Millers' Mutual Fire Insurance Association v. Warroad Potato Growers Ass'n, *supra* (applying Minnesota law, following the minority view), the policy again purported only to cover legal liability on the loss of the property. The policy was written to make "liability" modify only the word "loss" by making liability contingent upon loss.[5] All of these cases, therefore, are consistent with the theory of United States v. Globe & Rutgers Fire Ins. Co., *supra*, insofar as that case recognized that if the policy provision expressly reads or otherwise indicates that the insurance is "on the liability," then a recovery cannot be had by the "real owners" of the property without a showing of negligence of the bailee. Thus, the contract must be interpreted and construed to determine whether it was intended to cover the liability of the insured to respond in damages or his responsibility for the property. With this proposition, none of the cases are in conflict. See the following analysis in Anno., Fire Insurance—Insured's Bailor, 67 A.L.R.2d at 1244:

"At one extreme are the decisions in which clauses covering property contained in specific places and for which the insured 'is,' 'are,' 'may be,' or 'shall be' liable, used independently of trust and commission provisions, have been held to insure the property of others while in the insured's custody and control, the courts stating that the word 'liable,' as used in the provision, refers not to a particular fixed legal liability to respond in pecuniary damages, but may instead be equated with 'responsibility,' since a bailee is 'responsible' for the goods of the bailor. Thus, they have held that it is not necessary that there be a showing of the insured's contractual or tort liability to the owner in order to recover the full value of customers' or bailors' property when it is damaged or destroyed by fire while in the insured's building, warehouse, or other location specified in or covered by the policy.

"At the other extreme are decisions in which the fire policy covered insured's 'interest in and legal liability for' property of others, or property held in trust, on commission, on storage, or otherwise. Here the courts have generally held that the policy was one of indemnity only, that it insured not property but only the liability of the insured with respect to property, and

---

4. In the *Orient* case, the Court was very explicit on this point, saying:

"Concededly, Skellet Co.'s relation to the owners of the stored goods and its interest in them was such as entitled it to take out insurance for their protection. Any expression in an insurance contract signifying that intent and purpose is sufficient. To that end the clause 'for which they may be legally liable' should have been omitted, or there should have been a statement that the goods described were held in trust, or a similar expression of like import should have been used,—and then there could be no doubt that the contract was made in the name of Skellet Co. for the benefit of the real owners." 28 F.2d at 970.

5. Again, following Orient Ins. Co. v. Skellet Co. (C.A. 8) 28 F.2d 968, the *Warroad* case recognized that provisions covering the property would bring about a different result. The Court cited California Insurance Co. v. Union Compress Co., 133 U.S. 387, 10 S.Ct. 365, 33 L.Ed. 730, wherein it was held that the language of a policy "insuring cotton 'their own or held by them in trust or on commission'" insures "all the cotton which was placed in the hands of the plaintiff" by other companies. 133 U.S. at 409, 10 S.Ct. at 369, 33 L.Ed. at 736.

that there could be no recovery from the insurer for customers' or bailors' goods unless the insured himself had incurred legal liability, or at least a pecuniary obligation, because the loss was due to negligence for which he was responsible or because he had contractually assumed liability for loss of the property.

> *"Both of these views would seem to be correct, for it is apparently recognized as a rule of construction that if the primary intention of the policy is to insure property, then the property of others will be included, but that when the intent is only to insure against liability, and not to insure property, then only the legal liability of the insured with respect to the property will be covered."* (Emphasis added.)

To the same effect, see Home Insurance Company of New York v. Baltimore Warehouse Company, 93 U.S. 527, 23 L. Ed. 868. See also the cases distinguished in United States v. Globe & Rutgers Fire Ins. Co., *supra*, 202 F.2d at 697, n. 1, and in Texas City Terminal Ry. Co. v. American Equitable Assur. Co. (S.D.Tex.) 130 F.Supp. 843, 855. The general applicability of the principle is recognized in 43 Am.Jur.2d Insurance § 311, where it is noted that:

> "Policies are frequently issued to persons holding, storing, repairing, or selling property for others, and the question has frequently arisen as to what property is covered by policies issued to such persons. Where policy provisions show an intention to insure for the benefit of owners other than the insured, property conforming to the description in the policy although owned by bailors or customers of the insured has been held covered. Courts have found that an intention to insure property of others was shown by the fact that it was well known in the community that the insured was in the business of handling property belonging to others and was under a duty to insure it, or the fact that the description of types of property insured by definition was understood to include property belonging to others." pp. 373–374.

Further, the Missouri cases which have been decided generally on the subject of the meaning of "liable" have also concluded that the word must be interpreted and construed according to the manifest intent of the parties. As noted above, in Homan v. Employers Reinsurance Corporation, 345 Mo. 650, 136 S. W.2d 289, a plaintiff recovered two judgments against an insolvent bus line insured by an insolvent insurer. Thereafter, he brought suit against the reinsurer of the insolvent insurer. The court noted that the policy issued by the insolvent insurer to the insolvent bus line:

> " * * * agreed, not only to pay any final judgment for personal injuries caused by any of the said vehicles operated by the Stage Lines, but further agreed that upon failure to pay any such judgment, such judgment creditor could maintain an action in any court of competent jurisdiction to compel such payment." 136 S.W.2d at 298.

It was further noted that:

> "The reinsurance contract * * * provided that each reinsurance thereunder should be '*subject to*' all of the general and special terms of the policies and endorsements reinsured thereunder. * * * [Emphasis in original.]
>
> * * * * * *
>
> "The words 'subject to' are defined by lexicographers as meaning 'liable,' and the word 'liable' is defined as 'bound or obligated in law or equity; responsible; answerable.' Webster's New International Distionary, Second Edition; 60 C.J. 673; Hannibal Trust Co. v. Elzea, 315 Mo. 485, 286 S.W. 371, 377. * * * The particular clause of the contract provided [as noted above] that 'each reinsurance hereunder shall be subject to all the general and special terms and conditions of such policy and endorsements.' We think this clause should be construed in a reasonable and com-

mon sense manner with a view to the necessary intention of the parties at the time the contract was made. It meant, of course, only such terms and conditions as were reasonably applicable to such a contract of reinsurance between the parties and such terms and conditions, therefore, as the parties may be presumed to have had in mind when the contract was made. * * * If the reinsurance contract was not to be subject to the provisions set out in the primary insurance contract, to wit, that any judgment against Stage Lines be paid, the contract could have been made definite and certain. *Id.*

*   *   *   *   *   *

"In the case of Bruckner-Mitchell, Inc., v. Sun Indemnity Co. et al., 65 App.D.C. 178, 82 F.2d 434, 444, the court said: 'It is true that typical reinsurance agreements do not operate in favor of the original insured. They are merely contracts of indemnity of the insurer and there is no privity between the original insured and the reinsurer. But nothing in the law forbids drafting reinsurance agreements in special terms so that they will operate in favor of the original insured.'" 136 S.W.2d at 301.

Thus, in holding that the special terms of the reinsurance policy, in stating that it was "subject to" or "liable" to the provisions of the original insurance contract, provided for direct action of the injured party against the reinsurer because the insurance contract provided for such against the insurer, the Missouri Supreme Court concluded that:

"We believe that we have construed the contract as a whole and have arrived at its true intent and purpose from the terms used in the contract." 136 S.W.2d at 302.

The parties have agreed that Missouri law applied to the interpretation and construction of the contract in this case, and it appears that the contract of insurance was made in Missouri and that Missouri law applies.[6] Applying the rule that the meaning of the word "liable" must be construed according to "its true intent and purpose from the terms used in the contract" to the case at bar leads to the firm conclusion that the policy was intended to insure property for which Ar-Ka-Mo Sporting Goods, Inc., was responsible, rather than legal liability of Ar-Ka-Mo to plaintiff. The opening paragraph of the policy provides that:

"In consideration of the provisions and stipulations herein or added hereto and of the premium above specified, this Company, for the term of years specified from inception date shown above at Noon (Standard Time) to expiration date shown above at Noon (Standard Time) at location of *property* involved, to an amount not exceeding the amount(s) above specified, does insure the insured named above and legal representatives, to the extent of the actual cash value of the *property* at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss, without allowance for any increased cost of repair or reconstruction by reason of any ordinance or law regulating construction or repair, *and without compensation for loss resulting from interruption of business or manufacture*, nor in any event for more than the interest of the insured, against all direct loss by fire, lightning and by removal from premises insured against in this policy, except as hereinafter provided, to the *property* described herein while located or contained as described in this policy * * *." (Emphasis added.)

---

6. Both the place of making and the place of performance were Missouri. Although Missouri conflicts principles on contracts are not entirely clear, Taylor v. Royal Ins. Co. (W.D.Mo.) 235 F.Supp. 891, it appears that under almost any choice of law doctrine, Missouri law would apply under these facts and circumstances. See Phillips v. Englehart, Mo.App., 437 S.W. 2d 158.

An endorsement attached to the policy insures the insured "against all risks of direct physical loss of or to the *property covered*" (emphasis added) including, to a limit of $200,000.00, to "[*p*]*roperty* at locations owned, leased, operated, regularly used or specifically declared by the Insured" at "1531 Vernon, North Kansas City, Missouri." (Emphasis added.) Then, the policy goes on to cover the *personal property* of the type which plaintiff had bailed with Ar-Ka-Mo Sporting Goods, Inc. From the words and phrases used in the contract, viewed in its entirety, including its repeated use of the word "property" to define the subject matter of the insurance and specifically excluding business interruption and other insurance, the conclusion is that the policy in this case was meant to insure property rather than legal liability. The provisions of the contract, considered in the light of the whole contract, are unambiguous and clearly cover the losses pleaded in the first two counts of plaintiff's complaint. Judgment on the issue of liability only should therefore be entered on the first two counts in favor of plaintiff. It is admitted in the amended Standard Pretrial Order No. 2 that the particular risk is insured against; that the loss was suffered (although the amount thereof appears not to be admitted); and that demand for payment has been made and refused. Because the meaning of the contract, properly construed, is clear and certain, this cause is ripe for summary judgment on the issue of liability. See Cepeda v. Swift & Co. (C.A.8) 415 F.2d 1205.

Both parties made offers of proof of extrinsic evidence if the contract is found to be so ambiguous that extrinsic evidence is admissible to show its meaning. The contract is sufficiently clear that extrinsic evidence is inadmissible. The uncontroverted facts, properly to be considered in construing the policy contract, render resort to extrinsic evidence, offered by the parties, unnecessary and improper.

■ The proposition that, under Missouri law, evidence of prior conversations between the parties is not admissible to vary the clear terms of an unambiguous contract has recently been reaffirmed by the Missouri Supreme Court in Commerce Trust Company v. Howard, Mo., 429 S.W.2d 702, at 705, wherein it was stated (quoting National Corporation v. Allan, Mo.App., 280 S.W.2d 428, 432):

" 'Where the language of the contract on its face is not clear or is ambiguous, and resort to extrinsic evidence is necessary, if such evidence be conflicting, or, if not conflicting, different conclusions might reasonably be drawn therefrom, the construction of the agreement is for the jury under proper instructions from the Court. But where a contract is clear and unambiguous on its face, or where there is no real conflict of evidence upon any of the essential facts properly to be considered in construing the contract, and the true meaning of the words used is made clear by such evidence, it becomes the duty of the Court, and not the jury, to construe it. * * * * ' "

In the case at bar, the true meaning of the contract, properly construed in light of the admitted facts, is that it covers *property* rather than *liability*. Under the law of Missouri, as under the law generally, as noted above, this has the effect of including property of others possessed by the insured. Thus, in Ferguson v. Pekin Plow Company, 141 Mo. 161, 42 S.W. 711, a policy provision insuring property of the insureds "or held by them in trust or on commission or sold, but not renewed" was held to cover goods held on commission even though there was some evidence of an intent to restrict coverage to the goods of those with whom the insured had contracts at the date of the issuance of the policies. On that question, the Missouri Supreme Court stated as follows:

"But it is further urged that he did not intend to insure any goods but those belonging to parties with whom he had contracts at the date of the issuing of the policies. This conten-

tion is predicated upon an answer made by Mr. Ferguson to counsel for appellants during his examination in these words: 'Well, at the time I took out the policies, it would be those firms, I suppose, I had contracts with.' Upon this answer is built the claim that Ferguson, being under contract with those companies, only intended to secure them; but this is not a fair inference from his testimony. He had already testified that he took out the policies to protect himself and the property of the firms that he was doing business for or with. But the mere fact that on that particular day these were all the parties for whom he held goods would not and did not destroy the policy as to goods which he subsequently received of the class covered by his floating policies. The learned trial judge found that not only the language of the policies covered the respondents' goods, but, from Ferguson's testimony, that he intended to protect the parties whose goods he was handling, and respondents were included. His subsequent conduct in notifying all the parties, and in making proofs for all, leaves no doubt of what his intention was. While we fully concur with the court in so finding, we do not think it was competent to show his intention aliunde the stipulations of the policies. The policies were plain and unambiguous, and constituted the contract between the insurance companies and Ferguson, and parol evidence was not admissible to vary their effect, by showing that he had no intention of insuring the goods of parties he held on commission." 42 S.W. at 713.

Similarly, in the case at bar, the terms of the policy must prevail over any parol evidence which would tend to vary its terms.

According to some recent Missouri authority, see, e.g., Cornblath v. Fireman's Fund Insurance Company, Mo.App., 392 S.W.2d 648, the Court, under § 235(d) of the Restatement of the Law of Contracts, may, without making construc-

tion a jury question, with respect to an unambiguous contract, consider "the situation of the parties and the accompanying circumstances at the time [the contract] was entered into—not for the purpose of modifying or enlarging or curtailing its terms but to aid in determining the meaning to be given to the agreement." It is also provided, however, that:

"f. In an integrated contract * * * if accompanying circumstances indicate an intent at variance with any meaning that can be attached to the words of the contract, even when the words are looked at in the setting in which they were used, that intent can be given no effect unless the facts justify a reformation of the contract. * * * *" 392 S.W.2d at 651.

In making its offer of proof, in respect to the intent of the parties, the defendant stated as follows:

"1. The limits of the defendant's insurance policy were Two Hundred Thousand Dollars ($200,000.00), which not only included property owned by Ar-Ka-Mo Sales and Service Company but property of any other persons or companies who had bailed property to the plaintiff and for which the insured was liable * * *.

"2. At the inception of the defendant['s] insurance policy, the value of inventory of the Folger Coffee Company including advertising materials in storage at 1531 Vernon Street, North Kansas City, Missouri, exceeded the sum of Two Hundred Thousand Dollars ($200,000.00).

* * * * * *

"3. The defendant did not admit that either of the *losses* were insured against under the terms and conditions of the defendant's insurance policy * * *. [Emphasis added. It is admitted, however, that the particular risk was insured against.]

"4. Testimony of Mike Delich, supervisor for shipping, mailing and advertising for The Folger Coffee Company, Inc., [would be] that at the time The

Folger Coffee Company, Inc. and Ar-Ka-Mo Sales and Service Company entered into their contract * * * there was in storage in addition to premiums and prizes, certain advertising materials."

Defendant would thereby offer evidence tending to show that not all of the property of Folger came within the policy limits or the species of personal property described in the policy. These considerations, however, are immaterial to the issue of whether the described property of Folger Coffee Company, Inc., was intended to be insured up to the policy limit. Defendant states that its offers of proof are "in addition to those facts offered by the plaintiff or in contradiction to them." Plaintiff, in turn, offers to prove, in respect to the issue of intent, the deposition testimony of Raymond F. Tremel, President of Ar-Ka-Mo, that "Bill Heuerman, of the Folger Coffee Company" made the "decision as to the amount of insurance coverage" that defendant would be asked for; and that at "the inception date of the policy the only property that [Ar-Ka-Mo] held in [its] warehouse not belonging to [it] were [the] premiums and prizes that belonged to the Folger Coffee Company." Further offers of proof by plaintiff include the deposition testimony of Thomas F. Christian, Vice President of Ar-Ka-Mo, that when he contacted Cary Jones, defendant's representative, he advised Jones that he "wanted a policy of insurance that would cover the property that [Ar-Ka-Mo] was warehousing for Folger Coffee Company"; the deposition of Edward Basinger, defendant's senior multiple-line underwriter, to the effect that he believed that Ar-Ka-Mo was insuring only its own property, but that it was a "division of Folger's"; and the deposition testimony of defendant's assistant regional manager, John Gattorna, that defendant "knew at the time the policy was issued that this property described as premiums for prizes was owned by the Folger Coffee Company" and that the "intent at that time specifically was to cover Ar-Ka-

Mo's liability toward warehousing Folger's premiums for prizes." Clearly, none of these offers of proof, if considered, would warrant varying a policy which clearly and unambiguously provides for coverage of the property of Folgers Coffee Company if such, as is admitted, was in the custody of Ar-Ka-Mo at 1531 Vernon in North Kansas City when it was destroyed. In fact, these offers would tend to prove that coverage was intended.

Thus, under the clear language of the policy of insurance, construed under Missouri law, the offers of proof, held to be inadmissible, would support the construction that the property being held for Folgers and destroyed, was covered, regardless of the presence or absence of negligence on the part of Ar-Ka-Mo. The rule of Homan v. Employers Reinsurance Corporation, *supra*, continues to be the law in Missouri. See First National Bank of Kansas City v. Higgins, Mo. en banc, 357 S.W.2d 139. The case of Huddleston v. Manhatten Fire & Marine Ins. Co., 235 Mo.App. 776, 148 S.W.2d 74, is distinguishable in that it involved a liability policy covering goods for the loss or damage to which the insured carrier would be *"legally* liable" and "there was substantial evidence tending to prove that the damage to the wool was caused by the negligence of the carrier, for which damage the carrier might be held to be legally liable." 148 S.W.2d at 75. The issue in that case was whether the owner of the property damaged could bring a direct action against the insurer based on legal liability.

It is therefore

Adjudged that judgment be, and it is hereby, entered for plaintiff and against defendant on the issue of defendant's liability to plaintiff on the insurance policy of defendant numbered 1–00–19–31. The parties are requested to make their offers of proof, if any additional offers are necessary, on the issue of damages within 7 days of the date of entry of this judgment. Also, see note 1.